**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **Mike O. Salazar, An Individual,** | § | |
| **on behalf of himself and on** | § | |
| **behalf of all others similarly situated,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **Bloomin' Brands, Inc.;** | § | |
| **OSI Restaurant Partners, LLC;** | § | |
| **Outback Steakhouse of Florida, LLC;** | § | |
| **and OS Restaurant Services, LLC,** | § | |
| **f/k/a OS Restaurant Services, Inc.** | § | |
| **(all doing business as** | § | |
| **Outback Steakhouse #4425),** | § | |
| | § | |
| **Defendants.** | § | |

_____

**COMPLAINT AND JURY DEMAND**

_____

## I.  INTRODUCTION

**1.01.**  Plaintiff MIKE O. SALAZAR ("Salazar"), through undersigned counsel, on behalf of himself and all persons similarly situated, brings this civil action against Outback Steakhouse restaurants, his former employer. As described more fully below, Defendants unlawfully:

- intentionally discriminated against Salazar on the basis of gender while acting under the color of law of a federal Consent Decree;

- retaliated against Salazar for exercising rights granted to him by law;

- infringed Salazar's due process rights;

- violated the Fair Labor Standards Act;

- converted to their own use payroll deductions withheld from Salazar's wages; and

- negligently failed to provide a gender-neutral and fair workplace that complied both with the Consent Decree and with the Fair Labor Standards Act, by adopting inadequate training and supervision of Outback's supervisors and managers and inadequate policies, procedures, and practices.

**1.02.** Salazar seeks redress for himself for gender discrimination created by Defendants' fatally flawed implementation of a federal Consent Decree entered in 2009 to create a gender-neutral workplace in all Outback Steakhouse restaurants across the country. As described in more detail below, rather than implement the Consent Decree in a gender-neutral way, Defendants preferentially promoted less qualified women. Defendants then retaliated against Salazar by firing him when he complained about the discrimination.

**1.03.** Salazar is entitled to be reinstated and compensated for the denial of promotion opportunities and the loss of his job.

**1.04.** In addition to his individual gender discrimination and retaliation claims, Salazar files claims under the Fair Labor Standards Act as a collective action on his own behalf and on behalf of all similarly situated non-exempt hourly employees of Outback Steakhouse restaurants located throughout Texas. He seeks redress for the Defendants' blatant and willful unfair labor practices and retaliation against employees who complain about the unlawful practices. As described in more detail below, Defendants strategically implemented policies and procedures

designed to deprive non-exempt hourly employees, including Salazar, of earned pay by illegal paycheck calculations and deductions. Specifically, Outback failed to:

- compensate their employees for all of the hours they worked;

- pay their employees minimum wage for the hours they worked;

- pay their employees overtime compensation;

- compensate their employees for the hours they attended mandatory training; and

-  compensate their employees for hours worked while attending mandatory company meetings.

Defendants also consistently failed to inform their non-exempt hourly employees of the method by which they calculated combined hourly and tip wages or provide accurate itemized wage statements. Defendants' unlawful conduct was calculated and deliberate, and constitutes willful violations of the Fair Labor Standards Act.

**1.05.** Defendants denied hundreds of Texas employees their rightful wages. Salazar seeks on his own behalf and on behalf of similarly situated employees to recover the wages Defendants owe them.

**1.06.** Salazar brings his collective action under the Fair Labor Standards Act on his own behalf and on behalf of the following similarly situated individuals: all current and former hourly, non-exempt employees employed by Defendants at an Outback Steakhouse restaurant in Texas at any time during the statutory three-year time period, including but not limited to host, bartender, server, head wait server, line cook, take-away person, trainer, dishwasher, and busser.[1] As shown on Exhibit 1, attached, Salazar consents to the filing of this claim for unfair labor practices against Outback Steakhouse.

---

[1]      http://www.outback.com/our-company/careers/hourly (last visited February 18, 2015).

1.07.    As more fully described below, Defendants negligently failed to adequately train its supervisors and managers in the lawful implementation of the Consent Decree and the Fair Labor Standards Act. Defendants also negligently failed to adopt effective policies, procedures, and practices that ensured Outback's compliance with the Consent Decree and the Fair Labor Standards Act.

1.08.    Also as more fully described below, Defendants converted Salazar's earned wages and benefits by failing to accurately calculate and remit to the government funds withheld from Salazar's paychecks.

## II.  PARTIES

2.01.    Salazar is an individual and a citizen of both the State of Texas and the United States of America.  He resides in Corpus Christi, Nueces County, Texas.

2.02.    Defendant **BLOOMIN' BRANDS, INC**. is a foreign corporation organized and existing under the laws of the State of Delaware. Its home office is located at 2202 N. West Shore Blvd., Suite 500, Tampa, FL 33607. Bloomin' Brands is one of the world's largest casual dining companies, with approximately 95,000 domestic employees and more than 1,500 restaurants throughout 48 states, Puerto Rico, Guam, and 22 countries.[2] All Bloomin' Brands restaurants in Texas are company-owned.[3] One of Bloomin' Brands' restaurant brands is Outback Steakhouse, an Australian-themed casual dining restaurant chain with a "'No Rules, Just Right' mentality."[4] Bloomin' Brands is the parent company of OSI Restaurant Partners, LLC, which owns Outback Steakhouse of Florida, LLC, which in turn owns OS Restaurant

---

[2]    http://www.bloominbrands.com/ourcompany/ (last visited February 18, 2015).

[3]    http://investors.bloominbrands.com/secfiling.cfm?filingID=1546417-14-56&CIK=1546417  (last visited February 18, 2015).

[4]    http://www.bloominbrands.com/ourcompany/ (last visited February 18, 2015).

Services, LLC.[5] Bloomin' Brands engages in business in Texas directly and through its subsidiaries. This suit arose from Bloomin' Brands' business in Texas. Bloomin' Brands does not maintain a regular place of business in Texas or a registered agent for service of summons in Texas. Therefore, in the absence of a filed waiver under Rule 4(d) of the Federal Rules of Civil Procedure, Bloomin' Brands may be served by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701, as its agent for service.

2.03. Defendant **OSI RESTAURANT PARTNERS, LLC** ("OSI") is a limited liability company organized and existing under the laws of the State of Delaware. Its home office is located at 2202 N. West Shore Blvd., Suite 500, Tampa, FL 33607. OSI is a subsidiary of Bloomin' Brands and owns Outback Steakhouse of Florida, LLC. OSI engages in business in Texas directly and through its subsidiaries. This suit arose from OSI's business in Texas. OSI does not maintain a regular place of business in Texas or a registered agent for service of summons in Texas. Therefore, in the absence of a filed waiver under Rule 4(d) of the Federal Rules of Civil Procedure, OSI may be served by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701, as its agent for service.

2.04. Defendant **OUTBACK STEAKHOUSE OF FLORIDA, LLC** ("OSF") is a limited liability company organized and existing under the laws of the State of Florida. OSF is a wholly owned subsidiary of OSI and the owner of OS Restaurant Services, LLC. OSF owns and operates Outback Steakhouse restaurants in Texas for Bloomin' Brands. OSF is authorized to do business in Texas as a foreign entity. In the absence of a filed waiver under Rule 4(d) of the Federal Rules of Civil Procedure, OSF's registered agent for service of summons is Corporate Creations Network, Inc., 4265 San Felipe, #1100, Houston, Texas 77027.

---

[5] http://www.sec.gov/Archives/edgar/data/1546417/000119312512153440/d319863dex211.htm (last visited February 18, 2015).

**2.05**.  Defendant **OS RESTAURANT SERVICES, LLC**, formerly known as OS Restaurant Services, Inc. ("OS"), is a limited liability company organized and existing under the laws of the State of Florida. OS is a wholly owned subsidiary of OSF. OS leases, owns, and operates Outback Steakhouse restaurants in Texas for Bloomin' Brands. OS is authorized to do business in Texas as a foreign entity. In the absence of a filed waiver under Rule 4(d) of the Federal Rules of Civil Procedure, OS's registered agent for service of summons is Corporate Creations Network, Inc., 4265 San Felipe, #1100, Houston, Texas 77027.

**2.06**.  Bloomin' Brands, OSI, OSF, and OS (collectively, "Outback") occupy the same principal place of business in Florida. They share common members, officers, managers, and directors. Bloomin' Brands maintains complete control, oversight, and direction over every aspect of every operation of all Outback Steakhouse restaurants in Texas by its subsidiaries OSI, OSF, and OS, including but not limited to centralized control of Outback's payroll functions and labor relations. Although Bloomin' Brands, OSI, OSF, and OS are superficially distinct entities, they engage in a single, integrated enterprise and constitute a single "employer" for purposes of the Civil Rights Act of 1964, the Texas Labor Code, and the FLSA.

**2.07**.  Outback operates 48 Outback Steakhouse restaurants in Texas.[6] Included among Outback's Texas restaurants is Outback Steakhouse #4425, by which Outback does business in Corpus Christi, Texas (the "Workplace").

**2.08**.  Outback has been and continues to be an employer engaged in interstate commerce within the meaning of 29 U.S.C. § 206(a) and 29 U.S.C. § 207(a).

---

[6]   http://www.outback.com/locations#directory (last visited February 18, 2015).

### III.  JURISDICTION AND VENUE

### A.  Personal Jurisdiction

**3.01.**   Bloomin' Brands, OSI, OSF, and OS each has systematic and continuous contacts with the State of Texas, including but not limited to Outback's operation of the Workplace. Each has purposefully directed its activities at residents of the State of Texas. This civil action results from damages that arise out of those activities. Therefore, this Court has personal jurisdiction over Bloomin' Brands, OSI, OSF, and OS in litigation in Texas to which each is a party, specifically for the claims that Salazar asserts against them.

### B.  Subject Matter Jurisdiction

### 1.  Claims Arising under Federal Law

**3.02.**   In this civil action, Salazar sues Outback under both federal law and Texas state law. He presents individual discrimination and retaliation claims under federal law pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17; 42 U.S.C. §§ 1983, 1985, and 1988; and individual and collective claims under Sections 215(a)(3) and 216(b) of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. ("FLSA"). He also challenges implementation of a federal Consent Decree.  To the extent this civil action arises under federal law, this Court has subject matter jurisdiction pursuant to Section 1331 of Title 28 of the United States Code (federal question jurisdiction).

### 2.  Claims Arising under Texas State Law

**3.03.**   Salazar also presents individual Texas state law claims pursuant to the Texas Commission on Human Rights Act ("TCHRA"), TEX. LABOR CODE §§ 21.001 to 21.556, as well as negligence and conversion claims. To the extent this civil action arises under state law, this

Court has subject matter jurisdiction pursuant to Section 1367 of Title 28 of the United States Code (supplemental jurisdiction).

## C. Venue

**3.04.** The illegal employment practices about which Salazar complains in this civil action occurred in the State of Texas. Specifically, Salazar was employed, discriminated against, retaliated against, and unlawfully fired in the State of Texas. Therefore, under Section 2000e-5(f)(3) of Title 42 of the United States Code, venue for Salazar's Title VII claims is proper in any judicial district in the State of Texas. Venue also is proper in any judicial district in Texas in which Outback does business, or in which the employment records related to Salazar's claims might be found. Outback does business in the Corpus Christi Division of the Southern District of Texas, and the Workplace is located there. Therefore, under Section 1391(b) of Title 28 of the United States Code, venue is proper in this judicial district.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

**4.01.** Salazar has exhausted all administrative remedies required as a prerequisite to filing this civil action. Specifically, within the deadline prescribed by Title VII, Salazar filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and, via a worksharing agreement, the Texas Commission on Human Rights ("TCHR"). The EEOC issued written notice of Salazar's right to sue and ostensibly mailed it on November 19, 2014. Salazar timely filed this civil action in accordance with tolling agreements (Exhibit 2). Therefore, Salazar has fulfilled all required conditions precedent to the filing of this civil action.

## V.  FACTUAL BACKGROUND

### A.  Outback's Creation of Property and Liberty Interests

#### 1.  By Federal Consent Decree

**5.01.**    At all times relevant to Salazar's claims, Outback was operating under a federal Consent Decree. Specifically, on December 29, 2009, a federal district court in Colorado signed a Consent Decree in gender discrimination litigation brought by the EEOC on behalf of women employees against Outback (the "Consent Decree"). *See* Case No. 06-cv-01935-CMA-KLM, styled *EEOC v. Outback Steakhouse of Florida, LLC, et al*. (the "EEOC Class Action"). The Consent Decree mandated that Outback adopt gender-neutral employment practices and procedures, as described in more detail below. The Consent Decree also provided for monitoring by the EEOC of Outback's implementation of the mandated remedial practices and procedures.

**5.02.**    The Consent Decree was facially gender-neutral. That is, the Consent Decree mandated on its face that Outback take specific remedial actions to prevent all gender discrimination in the workplace, not just discrimination against women, particularly in providing equal promotion opportunities. Specifically, the Consent Decree affirmed that "[n]othing in this Consent Decree shall be construed to limit or reduce Outback's obligation to comply with the statutes enforced by the EEOC." Further, the Consent Decree enjoined Outback during the term of the Consent Decree "from discriminating against any employee or applicant on the basis of gender, in hiring, promotion, pay, terms and conditions of employment." It also formalized Outback's policies that mandated "gender-neutral and non discriminatory selections based on qualifications, experience, and performance" and forbade "selection decisions on prohibited factors such as gender, age, race, color, national original or religion."

**5.03.**   The Consent Decree mandated implementation of an on-line "Registry of Interest" management application process (known within Outback as "TALEO"). The Registration of Interest was designed to rectify discrimination against women in promotion decisions at Outback in filling supervisory and managerial positions (Key, Assistant Kitchen Manager ("AKM"), Service Tech, Food Tech, Kitchen Manager, Manager and Managing Partner).

**5.04.**   The Consent Decree expressly provided that "[e]mployees who have not expressed interest through the Registry will not be considered for promotion to a Registry position."

**5.05.**   The Consent Decree provided for monitoring of the Registry of Interest by a "Consultant," who was authorized to accumulate and analyze Outback's promotion statistics generated by the Registry of Interest. The Consent Decree provided that the Consultant would report her findings for monitoring by the EEOC of Outback's compliance with the mandated remedial measures.

**5.06.**   The Consent Decree expressly provided that "Hiring Managers may give preference" to "Employees in the Store or Region," specifically "to candidates working in the store where the vacancy exists" in filling "AKM and Key positions." Pursuant to Outback's promotion policies and procedures, AKM and Key positions are non-exempt hourly supervisory positions from which Outback promotes its employees into salaried, managerial positions.

**5.07.**   Finally, the Consent Decree enjoined Outback from "retaliating against any employee … [for] complaining about or opposing any employment practice made unlawful by one or more of the statutes enforced by the EEOC."

**5.08.** The Consent Decree created and defined Outback's existing rules and understandings, independent of Texas state law, regarding Outback's promotion practices and procedures. Specifically, by mandating gender-neutral promotion practices and procedures that were monitored by the EEOC, including the mandated on-line "Registry of Interest," the Consent Decree created in all Outback's employees, including Salazar, a legitimate claim of entitlement that Outback would follow the mandated procedures in providing gender-neutral promotion opportunities. By entering into the Consent Decree, Outback created a property interest.

## 2. By Outback's Uniform Employment Policies and Procedures

**5.09.** In its written "*Employee Handbook*," Outback applies uniform employment policies and procedures that created and defined Outback's existing rules and understandings, independent of Texas state law, regarding Outback's promotion, discipline, and termination procedures. In addition, Outback's uniform written "*Discrimination and Harassment Policy*," "*Equal Employment Opportunity Policy*," and "*Registration of Interest and Promotion Policies*" created and defined Outback's existing rules and understandings, independent of Texas state law. Specifically, by mandating employment policies and procedures regarding promotion, discipline, and termination, Outback created in all its employees, including Salazar, a legitimate claim of entitlement that Outback would follow the mandated policies and procedures. By creating and implementing uniform written policies and procedures in its employee handbook and other materials, Outback created a property interest.

## 3. By Outback's Ethics Code

**5.10.** Outback also applies uniform employment policies and procedures in its written "*Code of Business Conduct and Ethics*" that created and defined Outback's existing rules and understandings, independent of Texas state law (the "Ethics Code"). Specifically, by mandating

employment policies and procedures that require employees to report violations of the law within the company, establishes reporting procedures, and prohibits retaliation against those reporting, Outback created in all its employees, including Salazar, a legitimate claim of entitlement that Outback would follow the mandated policies and procedures. By creating and applying uniform written ethics policies and procedures, Outback created a property interest.

## B.  State Action under Color of Law

5.11.　Pursuant to the Consent Decree, Outback entered into an agreement with the EEOC to create and implement gender-neutral promotion policies, practices, and procedures that would ensure equal promotion opportunities in the Workplace. A federal court approved the Consent Decree. Outback acted in concert with the EEOC in creating and implementing the policies, practices, and procedures. The EEOC monitored Outback's implementation of the promotion policies, practices, and procedures.

5.12.　Despite the gender-neutral policies expressed in the Consent Decree, Outback and the EEOC's implementation of Outback's promotion practices and procedures mandated by the Consent Decree did not create gender-neutral promotion opportunities for all Outback employees. Instead, as implemented by Outback under the EEOC's monitoring, Outback's promotion practices and procedures mandated by the Consent Decree illegally discriminated against Outback's male employees, including Salazar, by preferentially promoting women over more qualified men.

5.13.　Outback and the EEOC's implementation of the promotion practices and procedures mandated by the Consent Decree illegally discriminated against Outback's male employees, including Salazar, even when the Consent Decree permitted a Hiring Manager to give preference to in-store male applicants.

**5.14.**   By acting in concert with a state actor (the EEOC) to deprive Salazar of his constitutional equal protection rights, Outback became liable as a state actor. Accordingly, at all times relevant to this civil action, Outback's actions in concert with the EEOC as a state actor were taken under the color of law created by the Consent Decree in implementing the promotion practices and procedures mandated by the Consent Decree.

### C.  Illegal Gender Discrimination under Title VII and 42 U.S.C. § 1983

**5.15.**   Outback first employed Salazar in 2006 as a non-exempt employee who was compensated by the hour and as a tip employee. Salazar briefly left Outback's employment in 2009. Outback rehired him on March 26, 2010. Outback then terminated Salazar's employment on April 13, 2014. In all, Salazar worked for Outback for nine years.

**5.16.**   Unbeknownst to Salazar until later, by the time of his rehiring in March 2010, Outback was operating under the Consent Decree, which had been signed less than 90 days before his return in March 2010.[7] The Consent Decree "cover[ed] all of Outback's corporately owned restaurants within the United States" and was to "remain in effect for four (4) years" (through December 29, 2013). The federal court expressly found that its approval of the Consent Decree would "further the objectives of Title VII." For its part, Outback entered into the Consent Decree "with the hope and expectation that Outback will enjoy, for many years to come, a strong and mutually beneficial relationship with **all** its employees, including its female employees."

**5.17.**   After his re-employment in March 2010, Salazar worked for the next two years as a non-exempt employee for hourly compensation and tips. He was an exemplary employee. He did not receive a single "write up." To the contrary, Salazar's personnel records reflect written

---

[7]     The Consent Decree mandated posting "[w]ithin sixty (60) days" of December 29, 2009 a "Notice of Final Approval of Settlement" . . . in all corporate-owned Outback Steakhouse restaurants." Salazar's re-employment on March 26, 2010 did not occur until almost a month after the last date for the required posting.

commendations by Salazar's supervisors and managers throughout the course of his employment. Specifically, by letter dated November 16, 2010, Outback's then-Proprietor of the Workplace lauded Salazar as "clearly a responsible leader who gets along well with people and possesses wonderful communication skills." Outback noted in January 2012 that Salazar was a current employee in the region and was the '[m]ost qualified candidate" for promotion to a "Key" supervisory position. Outback also noted in January 2012 that Salazar had "NO current documented Performance/Discipline Issues." Further, after his termination, the Proprietor of the Workplace volunteered to provide a reference and recommendation for Salazar.

5.18.    In January 2012 (during the four-year term of the Consent Decree), Salazar expressed interest to Outback's then-Joint Venture Partner ("JVP") in charge of the Workplace in applying for a managerial position. By then, the Consent Decree had mandated the on-line TALEO "Registry of Interest" website for Outback employees to apply for supervisory and managerial positions (Key, AKM, Service Tech, Food Tech, Kitchen Manager, Manager and Managing Partner).

5.19.    Outback's then-JVP did not inform Salazar of the "Registry of Interest" online management application requirement. Nonetheless, in January 2012, Salazar began Outback's Manager in Training Program ("MIT"), even though he had not "registered his interest" online. Outback promised Salazar that he was "on track" for a salaried managerial position.

5.20.    As the necessary first step for advancement to management under Outback's promotion policies and procedures, Outback promoted Salazar to a "Key"/Bartender supervisory but non-managerial, hourly position.

5.21.    Salazar applied for and was qualified for a promotion for which Outback was seeking applicants. Outback accepted him into its MIT program. Salazar had worked for seven

years without a disciplinary "write up." Despite Salazar's longevity, exemplary employment record, and qualifications, Outback did not promote him. Managerial positions in the Workplace became vacant, but Salazar continued to work in a supervisory but non-managerial, hourly position as Bartender. Instead, Outback sought and promoted female candidates with far less longevity than Salazar, less supervisory experience, and even those with disciplinary "write ups."

**5.22.**    Specifically, instead of promoting Salazar, Outback hired or promoted at least four (4) less-qualified women to Key or managerial positions in the Workplace.

**5.23.**    Outback hired and promoted women from outside the store and region to fill vacant supervisory and managerial positions in the Workplace, even though the Consent Decree permitted Outback's Hiring Managers to give preference to Salazar as an in-store applicant.

### D.  The Retaliation

### 1.  The FLSA Complaint

**5.24.**    Meanwhile, Outback employees in the Workplace, including Salazar, began to complain to supervisors that Outback refused to pay them for the time spent in mandatory meetings. Outback employees sued the company in federal class action litigation in Nevada that alleged FLSA violations (Case No. 2:13-cv-01820-JAD-NJK, *Cardoza, et al. v. Bloomin' Brands, Inc., et al.* (the "FLSA Class Action").)[8]

**5.25.**    On reading in November 2013 about the FLSA Class Action, Salazar realized that the hourly compensation policies and procedures employees in the Workplace had been complaining about were being challenged in the FLSA Class Action. He questioned his

---

[8]       The federal district court in the FLSA Class Action certified state-by-state subclasses in October 2014. No Texas subclass was certified. A second federal class action suit in California raises complaints similar to the allegations in the FLSA Class Action under California state law. *See* Case No. 4:13-cv-05961-KAW, *Gehl, et al. v. Bloomin' Brands, et al*. Originally filed in California state court, the *Gehl* suit was removed by Outback based on the large potential class of California Outback employees and the size of the aggregated amount in controversy. To date, Texas Outback employees are not included within either of these two pending class actions.

supervisor about his status as a potential class member, and complained to his supervisor about Outback's failure to pay him minimum wage, overtime wages, for required work hours before and after his shift, and for training time.

**5.26.** The supervisor did not act on Salazar's FLSA complaint. Nor did the supervisor provide Salazar any information about the FLSA Class Action or even inform him where he could obtain information about his status as a potential class member.

**5.27.** Instead, the supervisor threatened retaliation against Salazar and his spouse (who also worked for Outback) if Salazar joined the FLSA Class Action. The supervisor told Salazar that he (and his spouse) would lose more in reduced hours and unfavorable section assignments than he would gain as a class member. The supervisor further discouraged Salazar from becoming a class member by telling him that he could expect "only $200," which the supervisor represented was the amount awarded to female class members under the Consent Decree. The supervisor's statement was false. The supervisor sabotaged the collective action notice process in the FLSA Class Action.

## 2.  The Ethics Code and Conversion Complaints

**5.28.** In the wake of the FLSA Class Action, Outback employees in the Workplace, including Salazar, began to question supervisors about how Outback's paycheck calculations and deductions always resulted in a zero net paycheck, without exception ("Zero Net Paycheck"). Salazar complained of Outback's failure to properly calculate and remit to the government all of the funds withheld from their paychecks or provide accurate wage statements. Salazar demanded that Outback pay the deducted taxes and FICA contributions. Outback refused. The Zero Net Paycheck practice continues to the date of filing of this civil action.

5.29.   Specifically, on April 8, 2014, in a letter to Outback's Executive Vice President and Chief Legal Officer citing Outback's Ethics Code, Salazar repeated his reports of multiple violations of Outback's Ethics Code and Outback management's failure to effectively address the problems. Specifically, Salazar had reported to his supervisors repeated thefts by a female employee in the Workplace. He reported that the female employee had been charged with theft, and that a warrant had issued for her arrest. He also reported irregularities in tip pool calculations and withholding on taxes on credit card tips and a percentage of cash sales. In the same letter, Salazar reported his stress and anxiety over the situation and a growing "schism" between employees in the Workplace. He asked for an investigation of his report.

5.30.   In fact, the female employee whom Salazar reported for theft had been charged on October 28, 2013 with Class B misdemeanor theft (greater than $50 but less than $500). Nonetheless, Outback continued to employer her, and even promoted her into the MIT program. On January 29, 2015, she entered a plea to the theft charge. On February 20, 2015, she agreed to six months' pretrial diversion. Outback continues to employ the thief, but transferred her from the Workplace to another Texas Outback restaurant.

### 3.  Retaliation for the FLSA, Ethics Code, and Conversion Complaints

5.31.   Following Salazar's FLSA complaints, despite provision in the Consent Decree that permitted Outback's Hiring Managers to give preference to Salazar in filling AKM positions, Salazar's advancement at Outback came to an abrupt halt.

5.32.    Salazar continued to perform as an exemplary employee. Salazar's supervisor instructed him to sternly exercise his supervisory authority as the only way to maintain discipline in the Workplace. Salazar complied with his supervisor's instructions, and received commendations for his supervisory skill.

**5.33.**   Notwithstanding the high quality of Salazar's work, Outback's continued reliance on his exemplary supervisory skills, and the absence of any disciplinary "write ups" for during the many years of his Outback employment, Salazar remained at the hourly, non-managerial Key/Bartender entry-level supervisory position. Instead of promoting Salazar to an AKM position from which he then would be eligible for a salaried managerial position, Outback stalled any further advancement by Salazar.

**5.34.**   Notwithstanding anti-retaliation provisions in the Ethics Code, Outback then terminated Salazar within days of his April 8, 2014 letter in which he reported numerous Ethics Code violations on which his supervisors had failed to act as well as Outback's miscalculation and conversion of withholding deductions.

### 4.  Retaliation under Title VII and 42 U.S.C. § 1983

**5.35.**   After Salazar began the MIT program in January 2012, Outback began repeatedly hiring and promoting less-qualified women over Salazar to vacant supervisory and managerial positions in the Workplace. Salazar had learned about the EEOC Class Action from his supervisor, when she told him that women who participated in the class recovered "only $200." After that conversation with his supervisor, Salazar realized why he was being passed over for promotion. During the term of the Consent Decree in November 2013, Salazar reported to his supervisor that he was being passed over for promotion in favor of less-qualified women, in accordance with Outback's mandated reporting practices and procedures. Like the then-JVP to whom Salazar had first expressed an interest in management in January 2012, the supervisor to whom Salazar reported in 2013 that he was illegally being passed over for promotion did not inform Salazar of the online "Registry of Interest" application process mandated by the Consent Decree.

**5.36.**     Months went by. Finally, on February 24, 2014, Salazar tried to report his concern about gender discrimination and the related denial of his managerial promotion opportunities to the Outback "Proprietor" in charge of the Workplace. When Salazar mentioned gender discrimination, the Proprietor became noticeably angry, told Salazar that she was "reporting this to Corporate and that someone from Human Resources would contact him," and abruptly ended the conversation.

**5.37.**     Salazar did not hear from "Human Resources." Finally, in an email to a second, new JVP in charge of the Workplace nearly two (2) months after reporting the illegal discrimination to the Proprietor, Salazar reiterated his report about Outback's denial of promotion opportunities due to gender discrimination. The new JVP then telephoned Salazar on April 13, 2014 (the "Termination Conversation").

**5.38.**     During the course of the Termination Conversation, it became apparent to Salazar that the new JVP's purpose in contacting Salazar was not to discuss Salazar's gender discrimination complaint. Rather, the new JVP informed Salazar that the new JVP had been "investigating" allegations that Salazar "bullied" and "intimidated" other employees.

**5.39.**     Salazar was surprised by the new JVP's revelation of an investigation into his conduct in the Workplace. Salazar told the new JVP that he knew nothing of any such allegations, and that his conversation with the new JVP was the first time he had heard the allegations.  Specifically, Salazar had not received a single disciplinary "write up" in nine years, much less a "write up" about his conduct, either in or out of the Workplace.

**5.40.**     Pursuant to Outback's discipline procedures, Salazar asked the new JVP for an opportunity to respond to the allegations and clear his name. The new JVP refused.

**5.41.**  At the end of the Termination Conversation on April 13, 2014 between Salazar and the new JVP, the new JVP terminated Salazar from his position at Outback.

**5.42.**  Contrary to Outback's written discipline and termination practices and procedures, Outback did not provide any written notice to Salazar of his termination or any reasons for it.

**5.43.**  Contrary to Outback's written policies, practices, and procedures that both required Salazar to report violations of the law in the Workplace and prohibited retaliation against him, Outback fired him. Salazar's termination was in direct retaliation for his reports to multiple supervisors about violations of the law in the Workplace, including but not limited to illegal gender discrimination in the Workplace.

### E.  Deprivation of Liberty Interest

**5.44.**  In discharging Salazar, Outback falsely accused him of "bullying" and "intimidating" other employees. Outback's false charges stigmatized Salazar. Outback did not provide any notice to Salazar or an opportunity to be heard prior to the discharge. Salazar asked for a hearing to clear his name, but Outback refused his request.

**5.45.**  Salazar did not return to the workplace after the telephone conversation on April 13, 2014 in which the new JVP fired him.

**5.46.**  Outback then made public the false charges of "bullying" and "intimidation." Specifically, Outback told other Outback employees about the false charges. Those employees then harassed Salazar publicly at a sporting event Salazar and his family attended. Outback's employees' harassment was so violent, extreme, and disturbing that the venue ejected the Outback employees from the sporting event.

## F.  Conspiracy under 42 U.S.C. § 1985(3)

**5.47.**   Bloomin' Brands, OSI, OSF, and OS are distinct entities. One or more of OSI, OSF, and OS conspired with Bloomin' Brands, or two or more of OSI, OSF, and OS conspired with each other, to deprive male Outback employees, including Salazar, of equal protection of the laws.

**5.48.**   Specifically, two or more of the entities agreed with one another to illegally implement the remedial measures mandated by the Consent Decree by preferentially hiring and promoting women into vacant supervisory and managerial positions in the Workplace, instead of "in store" male applicants, including Salazar, who were more experienced and qualified.

## G.  The FLSA Violations

**5.49.**   The FLSA requires employers to pay non-exempt hourly employees a statutory minimum hourly wage. Further, for each hour an employee works in excess of 40 hours in a given week, employers must pay an overtime wage that is at least one and one-half times the employee's regular rate.

**5.50.**   Outback paid Salazar hourly wages that were less than the federal minimum wage.

**5.51.**   Outback paid Salazar overtime wages that were less than the federal overtime wage.

**5.52.**   Under limited circumstances, an employer may pay a "tipped employee" an hourly wage that is less than the minimum wage. Specifically, the employer may pay an employee an hourly wage of no less than $2.13 if the amount of the tips the employee actually receives, added to the hourly wage the employer pays, is at least equal to the minimum wage in effect under section 206(a) of the FLSA. This practice is known as taking a "tip credit."

**5.53.** The FLSA prohibits an employer from taking a tip credit and paying a non-exempt hourly employee $2.13 an hour "unless such employee has been informed by the employer of the [tip credit] provisions" of section 203(m).

**5.54.** Moreover, the employer may not take a tip credit "with respect to any tipped employee unless … all tips received by such employee have been retained by the employee," except when tips are pooled "among employees who customarily and regularly receive tips."

**5.55.** Outback did not inform Salazar about the tip credit provisions of section 203(m).

**5.56.** In addition to a statutory minimum hourly wage of $2.13, Salazar received tips from customers. Outback required Salazar to contribute daily a portion of the tips he received to a "tip pool," in accordance with Outback's policies and practices.

**5.57.** As bartender, Salazar was included within a tip pool contributed by other employees.

**5.58.** Outback periodically distributes a portion of all tip pools to the hourly employees in each pool, including Salazar. Outback does not explain its methods for calculating the percentage of each pool distributed to each employee.

**5.59.** Outback also periodically distributes a portion of all tip pools to salaried managers and/or other employees who do not customarily and regularly receive tips.

**5.60.** Outback also deducts losses due to cash register shortages and unpaid tabs from its non-exempt hourly employees' daily tips, including Salazar, in accordance with Outback's policies and practices.

**5.61.** Outback does not explain to its non-exempt hourly employees, including Salazar, the methods it uses to calculate tip pools, cash register shortages and unpaid tabs, hourly and overtime wages, tips, or withholding on credit card tips and cash sales.

**5.62.**    For each pay period, Outback manipulates its calculations of its non-exempt, hourly employees' gross hourly and overtime wages, tips, pooled tips, shortages and unpaid tabs, and withholding, including Salazar's, so as to yield a Zero Net Paycheck **every time**, regardless of how many hours the employee works or how much Outback calculates the employee received in tips. As a result, Outback deprives non-exempt hourly employees, including Salazar, of earned pay by illegal paycheck calculations and deductions.

**5.63.**    Outback's tip pool practices disqualify Outback from taking "tip credits" against its minimum wage obligations. Therefore, Outback violated the FLSA by paying Salazar less than minimum wage.

**5.64.**    Outback deprives non-exempt hourly employees, including Salazar, of earned pay by illegally withholding deductions from each paycheck.

**5.65.**    Outback deprives non-exempt hourly employees, including Salazar, of earned pay by not compensating them for all of the hours they work. Specifically, Outback requires "Outback Time," which is required time worked before Outback permits the employees, including Salazar, to "clock in" at the beginning of their shifts.

**5.66.**    Outback deprives non-exempt hourly employees, including Salazar, of earned pay by not paying the minimum wage mandated by the FLSA for the hours they work.

**5.67.**    Outback deprives non-exempt hourly employees, including Salazar, of earned pay by not paying overtime compensation mandated by the FLSA.

**5.68.**    Outback deprives non-exempt hourly employees, including Salazar, of earned pay by not compensating them for hours they work while engaged in mandatory training sessions. In particular, Outback does not pay its employees, including Salazar, for their required participation in Outback's uniform training system, previously referred to as "BBI University."

**5.69.**   Outback deprives non-exempt hourly employees, including Salazar, of earned pay by not compensating them for hours they worked while attending mandatory company meetings.

### H.  Outback's Conversion

**5.70.**   For each pay period, an employer must calculate an employee's total compensation in hourly and overtime wages and tips, deduct the employee's federal withholding and FICA contributions, and timely remit the withholding to the government.

**5.71.**   Outback fails to remit to the government the full amount of withholding it deducts from its non-exempt hourly employees wages, including Salazar's, in calculating each employee's Zero Net Paychecks.

### I.  Fatally Flawed Implementation of the Consent Decree

**5.72.**   Outback's implementation of the Consent Decree was fatally flawed. Specifically, Outback supervisors and managers systematically and intentionally failed to inform male employees, including Salazar, about the online "Registry of Interest" management application process. The result created misleading statistics about the size of Outback's female managerial applicant pool, by which Outback intended to mislead the Consultant mandated by the Consent Decree and the EEOC for purposes of compliance with the Consent Decree and EEOC's monitoring during the term of the Consent Decree.

**5.73.**   Further, as time deadlines expired for completion of sensitivity training mandated by the Consent Decree, Outback permitted supervisors and managers to "log in" under employees' passwords for the mandated training as well as the "Registry of Intent." The result created an intentionally false appearance that Outback timely complied with the training and gender-neutral promotion requirements of the Consent Decree.

### J.  Inadequate Training, Supervision, and Policies

### 1.  Implementation of the Consent Decree

### (a) Inadequate Training and Supervision – Gender Discrimination

**5.74.**   Outback failed to implement gender-neutral promotion opportunities in the Workplace mandated by the Consent Decree. Outback's fatally flawed implementation of the Consent Decree resulted from Outback's inadequate training and supervision of its supervisors and managers, as evidenced by the practice of: (1) not informing male applicants of the "Registration of Intent" requirement for consideration for management; and (2) permitting supervisors and managers to "log in" for employees to the "Registry of Intent" as well as for sensitivity training mandated by the Consent Decree, among other training and supervision failures.

**5.75.**   When viewed objectively from Outback's standpoint, Outback's failure to adequately train and supervise its supervisors and managers in implementation of the Consent Decree involved an extreme degree of risk, considering the probability and magnitude of the potential for violation of male employees' equal protection rights.

**5.76.**   Further, as evidenced by the facially gender-neutral mandates in the Consent Decree, Outback had actual, subjective awareness of the risk created by its failure to adequately supervise and train its supervisors and managers in implementation of the Consent Decree. Nonetheless, Outback proceeded in conscious indifference to the equal protection rights of its male employees. Outback was aware of the potential for violation of its male employees' equal protection rights, but its inadequate training and supervision of its supervisors and managers demonstrated that Outback did not care to address the risk. Outback's failure to adequately train

and supervise its supervisory and managerial employees in implementing the Consent Decree was grossly negligent.

### (b)   Inadequate Policies and Procedures – Gender Discrimination

**5.77.**   Outback failed to implement policies and procedures adequate to ensure compliance with the gender-neutral promotion opportunities in the Workplace mandated by the Consent Decree. Outback's fatally flawed implementation of the Consent Decree resulted from Outback's inadequate policies and procedures, as evidenced by its failure to implement a policy that permitted Hiring Managers to give promotion preference to qualified in-store male management applicants over outside female management applicants, among other policy and procedure failures.

**5.78.**   When viewed objectively from Outback's standpoint, Outback's failure to implement policies and procedures adequate to ensure compliance with the gender-neutral promotion opportunities in the Workplace mandated by the Consent Decree involved an extreme degree of risk, considering the probability and magnitude of the potential for violation of male employees' equal protection rights.

**5.79.**   Further, as evidenced by the Consent Decree's provision that permitted Hiring Managers to preferentially promote qualified in-store, in-region male employees, Outback had actual, subjective awareness of the risk created by its failure to implement policies, practices, and procedures adequate to ensure compliance with the gender-neutral promotion opportunities in the Workplace mandated by the Consent Decree. Nonetheless, Outback proceeded in conscious indifference to the equal protection rights of its male employees. Outback was aware of the potential for violation of its male employees' equal protection rights, but it adopted and implemented policies, practices, and procedures inadequate to ensure compliance with the

gender-neutral promotion opportunities in the Workplace mandated by the Consent Decree. Outback's failure to adopt adequate policies, practices, and procedures to implement the Consent Decree was grossly negligent.

## 2. Implementation of the FLSA

### (a) Inadequate Training and Supervision - FLSA

**5.80.** Outback failed to adequately train and supervise its supervisory and managerial employees in the procedures necessary to comply with the FLSA. Outback's FLSA violations resulted from Outback's inadequate training and supervision of its supervisors and managers, as evidenced by Outback's: (1) illegal "tip credit" policies and procedures; and (2) failure to comply with FLSA's requirement to notify employees of its "tip out" policy, among other training and supervision failures.

**5.81.** When viewed objectively from Outback's standpoint, Outback's failure to adequately train and supervise its supervisors and managers in the procedures necessary to comply with the FLSA involved an extreme degree of risk, considering the probability and magnitude of the potential for unfair labor practices inherent in Outback's "tip credit" policies and procedures.

**5.82.** Further, as evidenced by Outback's "tip credit" policies and procedures, including but not limited to Outback's failure to inform its employees, including Salazar, that Outback calculated "tip credits," Outback had actual, subjective awareness of the risk created by its failure to adequately supervise and train its supervisors and managers in implementation of the FLSA. Nonetheless, Outback proceeded in conscious indifference to the rights of its employees created by the FLSA. Outback was aware of the potential for violation of employees' rights under the FLSA, but its inadequate training and supervision of its supervisors and managers

demonstrated that Outback did not care to address the risk. Outback's failure to train and supervise its supervisory and managerial employees in procedures adequate to ensure compliance with the FLSA was grossly negligent.

**(b)  Inadequate Policies and Procedures - FLSA**

**5.83.**   Outback failed to implement policies and procedures adequate to ensure compliance with the FLSA. Outback's FLSA violations resulted from Outback's inadequate policies and procedures, as evidenced by its failure to implement a policy to notify non-exempt, hourly employees of its "tip credit" policies and procedures, among other policy and procedure failures.

**5.84.**   When viewed objectively from Outback's standpoint, Outback's failure to implement policies and procedures adequate to ensure compliance with the FLSA involved an extreme degree of risk, considering the probability and magnitude of the potential for violation of the FLSA.

**5.85.**   Further, as evidenced by Outback's "tip credit" practices and procedures, Outback had actual, subjective awareness of the risk created by its failure to adopt and implement policies and procedures adequate to ensure compliance with the FLSA. Nonetheless, Outback proceeded in conscious indifference to the employees' rights under the FLSA. Outback was aware of the potential for violation of its employees' rights under the FLSA, but it adopted and implemented policies and procedures inadequate to ensure compliance with the FLSA. Outback's failure to adopt and implement policies and procedures adequate to ensure compliance with the FLSA was grossly negligent.

## K. The Pretext

**5.86.** In the Termination Conversation on April 13, 2014, Outback's new JVP informed Salazar that Outback was investigating allegations that Salazar "bullied" and "intimidated" his co-workers. Outback reiterated those allegations in the EEOC proceeding in response to Salazar's charge of discrimination and retaliation. Outback also cited in the EEOC proceeding incidents that either allegedly occurred outside the Workplace or allegedly occurred months after Salazar's termination. Also, in the EEOC proceeding Outback cited Salazar's failure to "register his interest" as required by the Consent Decree, making Salazar ineligible for consideration for promotion. Outback now claims Salazar did register. Finally, although Outback admitted that it did not terminate Salazar until the Termination Conversation, Outback claimed in the EEOC proceeding that Outback had made its termination decision on April 4, 2014, more than a week before communicating any termination decision to Salazar. Outback did not provide Salazar with written notice of any of the termination reasons it now asserts, either before or after his termination.

**5.87.** A prohibited discriminatory or retaliatory motive was a factor in Outback's termination decision (whenever it was made) and is more likely to have motivated the decision than any of Outback's after-the-fact allegations regarding Salazar's conduct and failure to "register his interest" in promotion to manager. Specifically, Outback rehired Salazar in 2010 and continued to employ him for four more years, evidencing their satisfaction with his conduct in the Workplace. His nine-year personnel file does not reflect any "write ups" regarding his conduct in or out of the Workplace. To the contrary, an Outback Proprietor commended Salazar for his supervisory skills and volunteered to provide a reference and recommendation even after he was terminated. Also, Outback treated similarly situated female supervisory and managerial

applicants differently from Salazar by promoting less qualified female applicants and by informing female applicants and not males, including Salazar, of the "registration of interest" management requirement. Further, Outback admitted Salazar to the MIT program even though he had not "registered his interest." Moreover, Outback did not terminate a female employee who was charged with theft, but instead terminated Salazar, therefore treating Salazar, a male, more harshly for less severe alleged misconduct in the Workplace. Outback then deviated from its policies and procedures in terminating Salazar by not providing Salazar written notice of any of the termination reasons it now asserts, either before or after his termination, or providing an opportunity to be heard to clear his name of the false allegations. Finally, Outback now attempts to "backdate" its termination decision to April 4, 2014, even though it did not communicate the decision to Salazar until April 13, 2014. The "backdating" is intended to avoid direct evidence of retaliation for Salazar's April 8, 2014 letter to Outback's upper management.

**5.88.** Outback's after-the-fact explanations are false and unworthy of credence. There is no evidence that Salazar was anything other than an exemplary employee before Outback raised issues about Salazar's "bullying" in the Workplace in response to Salazar's report about gender discrimination. Moreover, Outback's explanations, even if accurate, are not the real reasons Outback fired Salazar. Outback's non-discriminatory reasons for firing Salazar are pretexts.

## VI. CLAIMS FOR RELIEF

**6.01.** Salazar incorporates for all purposes each of the facts alleged in Section I-V, above.

## A. The Federal Claims

### 1. First Federal Claim for Relief: Title VII (Gender Discrimination)

**6.02.** In violation of Title VII, Outback intentionally discriminated against Salazar in the terms and conditions of his employment on the basis of gender in preferentially hiring and promoting women for vacant supervisory and managerial positions instead of Salazar, who was more experienced and qualified than the female applicants Outback hired and promoted.

**6.03.** Outback failed to take prompt remedial action in response to Salazar's report to his supervisors of illegal gender discrimination.

**6.04.** Outback failed to perform an investigation in response to Salazar's report to his supervisors of illegal gender discrimination.

**6.05.** Instead of taking prompt remedial action or performing an investigation in response to Salazar's multiple reports to his supervisors of illegal gender discrimination, Outback refused to promote him.

**6.06.** Instead, Outback promoted the thieving female employee and fired Salazar.

**6.07.** Outback's illegal discrimination damaged Salazar to the extent of the difference between the wages he would have received had he been promoted and the wages he actually received.

**6.08.** Salazar is entitled to reinstatement at Outback as a supervisor or manager.

**6.09.** On prevailing on his Title VII discrimination claim, Salazar is entitled to recover a reasonable attorney fee (including expert fees) as part of the costs of litigation.

### 2. Second Federal Claim for Relief: Title VII (Retaliation)

**6.10.** In reporting illegal gender discrimination to his supervisors, Salazar engaged in an activity protected by Title VII. Salazar had at least a reasonable belief that Outback's policy,

practice, and procedure of preferentially hiring and promoting women into supervisory and managerial positions over more qualified men, including Salazar, were unlawful.

**6.11.** Salazar was subjected to an adverse employment action when he was fired.

**6.12**. A causal link exists between Salazar's protected activity and his termination. Specifically, the April 13, 2014 termination occurred in the immediate context of and in direct response to Salazar's reports in November 2013 and February and April 2014 to his supervisors of illegal gender discrimination in Outback's supervisory and managerial promotion decisions. The temporal connection between the protected activity and the adverse employment action proves the fact of intentional retaliation, without inference or presumption.

**6.13.** Outback's retaliation damaged Salazar to the extent of his lost "back pay" and his "front pay" (in lieu of reinstatement).

**6.14.** Salazar is entitled to reinstatement at Outback as a supervisor or manager.

**6.15.** On prevailing on his Title VII retaliation claim, Salazar is entitled to recover a reasonable attorney fee (including expert fees) as part of the costs of litigation.

### 3. Third Federal Claim for Relief: Violations of 42 U.S.C. § 1983

#### a. The Equal Protection Violation

**6.16.** Salazar is not a member of a protected class.

**6.17.** Salazar sustained a deprivation of his equal protection rights as a result of official policies, practices, or customs that Outback created and implemented while acting in concert with the EEOC in performing Outback's obligations under the Consent Decree.

**6.18.** The policies, practices, and customs created and implemented by Outback while acting in concert with the EEOC served as the moving force behind Outback's discrimination against Salazar in denying him advancement opportunities in favor of less-qualified women.

**6.19.** Salazar's injuries resulted from Outback's fatally flawed implementation of the remedial measures mandated by the Consent Decree, which implementation resulted in Outback's preferential promotion of women over more qualified men.

**6.20.** Outback's existing group of female candidates for supervisory and managerial positions was similarly situated to its group of male candidates. The female candidates were less experienced and qualified than Salazar. One female candidate had even committed multiple thefts in the Workplace. Outback promoted her anyway.

**6.21.** Outback treated Salazar differently than Outback's similarly situated group of women candidates for supervisory and managerial positions.

**6.22.** Outback's treatment of Salazar differently from Outback's similarly situated group of women candidates was without a reasonable basis. In particular, Outback's preferential hiring and promotion of women was prohibited by the Consent Decree and Outback's other written policies and procedures.

**6.23.** Outback's actions damaged Salazar to the extent of the difference between his actual wages and the wages he would have earned had Outback not discriminated against him in its promotion decisions.

### b. The First Amendment Retaliation

**6.24.** Salazar spoke out against matters of significant public concern when he reported a female employee's thefts and gender discrimination in the Workplace in Outback's implementation of the Consent Decree.

**6.25.** Salazar sustained a deprivation of his free speech rights as a result of official policies, practices, or customs that Outback created and implemented while acting in concert with the EEOC in performing Outback's obligations under the Consent Decree.

**6.26.**   The policies, practices, and customs created and implemented by Outback while acting in concert with the EEOC serve as the moving force behind Outback's violation of Salazar's First Amendment rights.

**6.27.**   A causal link exists between Salazar's protected activity and his termination. Specifically, the April 13, 2014 termination occurred in the immediate context of and in direct response to Salazar's reports in November 2013and February and April 2014 to his supervisors of illegal gender discrimination in Outback's supervisory and managerial promotion decisions. The temporal connection between the protected activity and the adverse employment action proves the fact of intentional retaliation, without inference or presumption.

**6.28.**   Outback's retaliation damaged Salazar to the extent of his lost income and benefits.

**6.29.**   Salazar is entitled to reinstatement at Outback as a supervisor or manager.

### c.  The Due Process Violations

#### (1)  The Substantive Due Process Violation

**6.30.**   By virtue of Outback's acts described above, Salazar had a recognized property interest in his continued employment.

**6.31.**   Under color of law, Outback intentionally or recklessly fired Salazar and deprived him of his property interest.

**6.32.**   Outback's actions damaged Salazar to the extent of his lost past and future earnings.

#### (2)  The Procedural Due Process Violations

**6.33.**   By virtue of Outback's acts described above, Salazar had a recognized property interest in Outback's promotion, discipline, and termination procedures.

**6.34.** Under color of law, Outback intentionally or recklessly failed to follow its promotion procedures.

**6.35.** Under color of law, Outback intentionally or recklessly failed to follow its discipline procedures.

**6.36.** Under color of law, Outback intentionally or recklessly failed to follow its termination procedures.

**6.37.** Outback's actions damaged Salazar to the extent of his lost past and future earnings.

### (3)  The Liberty Interest Violation

**6.38.** By virtue of Outback's acts described above, Salazar had a recognized liberty interest in being free from stigmatizing by Outback.

**6.39.** Under color of law, Outback intentionally or recklessly stigmatized Salazar when it fired him by making false accusations that he "bullied" and "intimidated" other employees.

**6.40.** Under color of law, Outback intentionally or recklessly failed to provide Salazar notice or an opportunity to be heard prior to firing him, despite Salazar's request for the opportunity to clear his name.

**6.41.** Under color of law, Outback intentionally or recklessly made the false charges public.

**6.42.** Outback's actions damaged Salazar's career opportunities, standing in his profession, and future earning capacity.

### d. Attorney Fees under 42 U.S.C. § 1988

**6.43.** On prevailing on a substantial issue raised under Section 1983, Salazar is entitled to recover his litigation expenses and reasonable attorney fees based on market rates for the services rendered, with an appropriate adjustment for delay in payment.

### 4. Fourth Federal Claim for Relief: Violation of 42 U.S.C. § 1985(3)

**6.44.** By virtue of their acts described above, Bloomin' Brands, OSI, OSF, and OS conspired to deprive Salazar of his equal protection rights.

**6.45.** Bloomin' Brands, OSI, OSF, and OS's actions in conspiring against Salazar damaged him to the extent of his lost past and future earnings.

**6.46.** On prevailing on a substantial issue raised under Section 1985, Salazar is entitled to recover his litigation expenses and reasonable attorney fees based on market rates for the services rendered, with an appropriate adjustment for delay in payment.

### 5. Fifth Federal Claim for Relief:  Violation of the FLSA 29 U.S.C. §201, *et seq.*

**6.47.** At all relevant times, as described above, Outback had a uniform policy and practice of willfully refusing to pay its non-exempt hourly employees, including Salazar, to the full extent required by the FLSA.

**6.48.** As a result of Outback's willful failure to compensate its employees, including Salazar, the applicable federal minimum wage for all hours worked and appropriate overtime compensation, Outback has violated, and continues to violate, the FLSA.

**6.49.** Outback's conduct constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. §255(a). Because of Outback's willful conduct, a three-year statute of limitations applies pursuant to 29 U.S.C. §255(a).

**6.50.**   Due to Outback's FLSA violations, Salazar, on his behalf and on behalf of others similarly situated, is entitled to recover from Outback compensation for unpaid wages; an additional equal amount as liquidated damages; and reasonable attorney fees, costs and disbursements of this action, pursuant to 29 U.S.C. §216(b).

## B.  State Causes of Action

### 1.  First State Claim for Relief: Texas Labor Code (Gender Discrimination)

**6.51.**   In violation of the TCHRA, Outback intentionally discriminated against Salazar in the terms and conditions of his employment on the basis of gender, by preferentially hiring and promoting women for vacant supervisory and managerial positions instead of more qualified male employees, including Salazar.

**6.52.**   Outback failed to take prompt remedial action in response to Salazar's report to his supervisors of illegal gender discrimination.

**6.53.**   Outback failed to perform an investigation in response to Salazar's report to his supervisors of illegal gender discrimination.

**6.54.**   Instead of taking prompt remedial action or performing an investigation in response to Salazar's report to his supervisors of illegal gender discrimination, Outback refused to promote him.

**6.55.**   Outback also violated the TCHRA in terminating Salazar in retaliation for reporting the illegal gender discrimination to his supervisors.

**6.56.**   Outback's illegal discrimination and retaliation damaged Salazar to the extent of the difference between the wages he would have received had he been promoted and the wages he actually received, lost back pay, and lost front pay.

**6.57.**   Salazar is entitled to reinstatement at Outback as a supervisor or manager.

## 2. Second State Claim for Relief: Negligence and Gross Negligence

**6.58.**     Outback owed its employees, including Salazar, a duty to adequately train and supervise its supervisory and managerial employees to protect its male employees' equal protection rights and all its employees' rights under the FLSA.

**6.59.**     Outback breached its duty to Salazar by negligently failing to adequately train and supervise its supervisory and managerial employees in implementing the Consent Decree.

**6.60.**     Outback breached its duty to Salazar by negligently failing to adequately train and supervise its supervisory and managerial employees in compliance with the FLSA.

**6.61.**     Outback's failure to adequately train and supervise its supervisory and managerial employees was grossly negligent.

**6.62.**     Outback breached its duty to Salazar by negligently failing to adopt policies and procedures that ensured its compliance with the Consent Decree.

**6.63.**     Outback breached its duty to Salazar by negligently failing to adopt effective policies and procedures that ensured its compliance with the FLSA.

**6.64.**     Outback's failure to adopt effective policies and procedures that ensured its compliance with the Consent Decree and with the FLSA was grossly negligent.

**6.65.**     Outback's negligence and gross negligence in failing to adequately train and supervise its employees and failing to adopt adequate policies and procedures caused Salazar damages in the form of lost income and diminished future earning capacity.

**6.66.**     Salazar is entitled to recover his compensatory damages and punitive damages for Outback's negligence and gross negligence.

### 3. Third State Claim for Relief: Conversion

**6.67.** Outback wrongfully assumed and exercised unauthorized dominion and control over personal property belonging to Salazar, specifically, deductions from wages to which he was legally entitled.

**6.68.** Salazar is entitled to recover damages for Outback's conversion of his property, i.e., the federal withholding and FICA contributions Outback deducted from his wages but failed to remit to the government.

## VII. JURY DEMAND

**7.01.** In accordance with Federal Rule of Civil Procedure 38, Salazar demands a trial by jury of all issues raised in this civil action that are triable of right (or choice) by a jury.

## VIII. DEMAND FOR JUDGMENT

**8.01.** Salazar respectfully requests certification of one or more classes under the Fair Labor Standards Act;

**8.02.** In accordance with Federal Rule of Civil Procedure 8(a), Salazar makes the following demand that judgment be issued in his favor on all his claims and respectfully requests that this Court:

**8.02.1.** Issue a declaratory judgment that Outback's acts, policies, and procedures violated Title VII and the TCHRA (declaratory relief);

**8.02.2.** Permanently enjoin Defendants, their officers, agents, successors, and employees, and those acting in concert with them, from engaging in any employment policy or practice that discriminates against any employee on the basis of gender or because of their participation in this civil action (injunctive relief);

**8.02.3.** Issue a monetary judgment in an amount equal to the difference between the wages and benefits Salazar actually received and the wages and benefits he would have received had he not been subjected to the unlawful practices described above (back pay), and interest thereon;

**8.02.4.** Issue an order reinstating Salazar as an Outback manager;

**8.02.5.** In lieu of reinstatement, issue a monetary judgment in an amount sufficient to reimburse Salazar for losses he is likely to suffer in the form of future pay and benefits (front pay);

**8.02.6.** Issue a monetary judgment in an amount sufficient to compensate Salazar for all other damages he has suffered as a result of Outback's violations of law as described herein (compensatory damages);

**8.02.7.** Issue a monetary judgment in an amount sufficient to punish Outback for its violations of law as described herein (punitive damages);

**8.02.8.** To the extent not otherwise requested herein, issue a judgment granting Salazar all damages and relief of any kind whatsoever made available under Sections 2000e-5(g) and Sections 1983 and 1985 of Title 42 of the United States Code;

**8.02.9.** To the greatest extent allowed by law, issue a monetary judgment granting Salazar pre-judgment and post-judgment interest on all amounts to which he is entitled;

**8.02.10.** Issue an award of compensation for unpaid wages, unpaid compensation for overtime, and unpaid minimum wage to Salazar and all others similarly situated;

**8.02.11.** Award liquidated damages to Salazar and all others similarly situated as provided by the FLSA;

**8.02.12.** Award Salazar attorney fees, expert witness fees, disbursements, and costs;

**8.02.13.** To the extent not otherwise requested herein, issue a monetary judgment in favor of Salazar for reinstatement, all back pay, front pay in lieu of reinstatement, compensatory damages, punitive damages, pre-judgment interest, post-judgment interest, attorneys' fees, and costs, to which he is entitled; and

**8.02.14.** Award Salazar such additional relief as this Court deems proper and just.


DATED:  March 2, 2015.

Respectfully submitted,

LAW OFFICE OF MYNOR E. RODRIGUEZ P.C.

*/s/ Mynor "Eddie" Rodriguez*
Mynor "Eddie" Rodriguez
Attorney in Charge
Texas Bar No. 24037381
Southern District of Texas Bar No. 1119822
Michael Prejean
Texas Bar No. 24092993
Southern District of Texas Bar No. 2513911
4265 San Felipe, Suite 1100
Houston, TX 77027
(713) 968-9828 (Office)
(832) 553-7420 (Facsimile)
mrodriguez@rodrrieztrialfirm.com

ATTORNEYS FOR PLAINTIFF
MIKE O. SALAZAR